**NEWPORT NEWS SHIPBUILDING
AND DRY DOCK COMPANY**

v.

**The UNITED STATES.**

No. 38–84C.

United States Claims Court.

March 20, 1985.

---

Donald C. Holmes, Washington, D.C., for plaintiff; D.J. Huneycutt and Stephen S. Kaye, Washington, D.C., of counsel.

Lynn J. Bush, Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard

K. Willard, Washington, D.C., for defendant; James F. Ford, Maritime Admin., Washington, D.C., of counsel.

## OPINION

YOCK, Judge.

This construction-differential subsidy contract case comes before this Court on the defendant's motion for summary judgment based on the grounds that this Court lacks jurisdiction over the plaintiff's suit. The plaintiff filed a brief in opposition to the defendant's motion and a cross-motion for partial summary judgment. The primary argument in both parties' briefs is whether the plaintiff's contract claim is within the scope of the Contract Disputes Act of 1978. 41 U.S.C. § 601 et seq. (1982). If it is, the plaintiff argues that it has properly invoked this Court's direct access jurisdiction. If it is not, the defendant argues that the plaintiff has failed to exhaust its administrative remedies before the Maritime Subsidy Board. For the reasons discussed below, the defendant's motion for summary judgment is granted, and the plaintiff's complaint is to be dismissed.

### Facts

This case involves the Government's construction-differential subsidy program, under the Merchant Marine Act of 1936. 46 U.S.C. § 1101 et seq. (1976). The subsidy program arose out of congressional concern that vital national security and commercial interests would be served if the Government equalized by subsidy the position of American-flag and foreign-flag shipowners with respect to operating expenses, construction costs, and foreign subsidies. Accordingly, the Government maintains a subsidy program designed to put the American-flag owner/purchaser on a parity with his foreign competitor.

On June 29, 1974, the plaintiff, Newport News Shipbuilding and Dry Dock Company (NNS), entered into two sets of contracts for the construction of two ultra large crude oil carriers (ULCC). Each of the two sets of contracts consisted of contracts between: (1) the plaintiff and the Government, (2) the purchaser and the plaintiff, and (3) the Government and the purchaser. Contract MA/MSB-318 was entered into between the Maritime Subsidy Board, United States Maritime Administration, U.S. Department of Commerce, and the plaintiff/shipbuilder for the construction of one of the two carriers, with construction-differential subsidy (CDS) payments to be made to the plaintiff by the Maritime Subsidy Board. On that same date, Contract MA/MSB-317 was entered into between the plaintiff and the ship purchaser, VLCC I Corporation (purchaser I). A third contract MA/MSB-319 was entered into between the Maritime Subsidy Board and purchaser I. With regard to the second set of contracts, Contract MA/MSB-321 was entered into between the Maritime Subsidy Board and the plaintiff on June 29, 1974, for the construction of the second crude oil carrier, with CDS payments to be made to the plaintiff by the Maritime Subsidy Board. As with the first set of contracts, contracts between the plaintiff and VLCC II Corporation (purchaser II) (Contract MA/MSB-320) and between the Maritime Subsidy Board and purchaser II (Contract MA/MSB-322) were signed.

Pursuant to both sets of contracts, the purchasers were obligated to NNS for 61.25 percent of the contract prices of the ships, and the Government was obligated to the plaintiff for 38.75 percent of the contract prices, exclusive of certain contract work ineligible for subsidy and exclusive of National Defense Features. The respective contract prices for the two sets of contracts were: (1) Contracts MA/MSB-317, 318, and 319—$139,619,000 for contract work, plus $66,000 for National Defense Features; and (2) Contracts MA/MSB-320, 321, and 322—$138,168,000 for contract work, plus $48,000 for National Defense Features.

During the performance of the contracts, the plaintiff's period of performance was extended as a result of delays it experienced. As a result, the first ULCC was delivered 397 days after its Initial Contract Delivery Date, and the second ULCC was

delivered 497 days after its Initial Contract Delivery Date. The plaintiff asserted that the causes of such delays were within the scope of the Extension of Time clause of the contracts and claimed entitlement to escalated cost adjustments pursuant to the Price Adjustment clause of the contracts. The plaintiff also claimed that, under the contracts' Price Adjustment clauses, the Maritime Subsidy Board was obligated to pay a certain portion of the claimed escalation adjustments to the plaintiff.

Subsequently, disputes arose between the plaintiff, the purchasers, and the Maritime Subsidy Board, concerning alleged excusable delays and resultant escalated cost adjustments claimed by the plaintiff. As regards the plaintiff and the purchasers, litigation ensued concerning the delayed deliveries. This litigation was finally concluded by settlement on January 5, 1984. The terms of such settlement included an agreement by the respective purchasers that the plaintiff was entitled to an extension of time under Article V of their contracts of 225 days on the first vessel and of 244 days on the second vessel.

Meanwhile, on February 1, 1979, and on July 19, 1979, the plaintiff submitted claims to the Chief, Office of Ship Construction (COSC),[1] for resulting monetary damages in excess of $50,000.[2] However, neither of these claims were certified, as required by 41 U.S.C. § 605(c)(1), nor indicated that they were filed in accordance with the Contract Disputes Act. 41 U.S.C. § 601 *et seq.* Finally, on January 26, 1984, the plaintiff submitted a certified claim to the COSC, seeking combined monetary damages in the amount of $4,271,419 for escalated cost adjustments and indicating that the plaintiff intended to proceed under the provisions of the Contract Disputes Act.

The next day, on January 27, 1984, prior to the issuance of a final decision by the COSC, the plaintiff filed its complaint with this Court, asserting entitlement to certain escalated cost adjustments, as well as "lost opportunity to earn a return on capital."

## Discussion

### I. Construction-Differential Subsidy Contracts

The history of the merchant ship subsidy system has been discussed by this Court's predecessor, the United States Court of Claims, in extensive detail. *See Oceanic Steamship Co. v. United States*, 218 Ct.Cl. 87, 93–94, 586 F.2d 774, 777 (1978); *American Export Isbrandtsen Lines, Inc. v. United States*, 204 Ct.Cl. 424, 431–37, 499 F.2d 552, 557–60 (1974); *Moore-McCormack Lines, Inc. v. United States*, 188 Ct.Cl. 644, 649–50, 413 F.2d 568, 570–71 (1969). The subsidy program is the product of congressional judgment that vital national security and commercial interests are served by the maintenance of ocean vessels under the United States registry.[3] The concern that Congress sought to address was the weakness of the American merchant marine, which was competitively disadvantaged by the lower costs incurred by foreign competitors. *Oceanic Steamship Co. v. United States, supra,* 218

---

1. The Chief, Office of Ship Construction, is the Maritime Administration's equivalent of a contracting officer.

2. The plaintiff claimed a minimum of 324 days of excusable delay for each ship. It also requested $5,278,036 in escalation compensation for ULCC 1 (MA/MSB–317), and $6,250,927 in escalation compensation for ULCC 2 (MA/MSB–320).

3. The purposes of the Merchant Marine Act, out of which the construction-differential subsidy program arises, are set out in 46 U.S.C. § 1101 as: "necessary for the national defense and development of its foreign and domestic commerce that the United States shall have a merchant marine (a) sufficient to carry its domestic water-borne commerce and a substantial portion of the water-borne export and import foreign commerce of the United States and to provide shipping service essential for maintaining the flow of such domestic and foreign water-borne commerce at all times, (b) capable of serving as a naval and military auxiliary in time of war or national emergency, (c) owned and operated under the United States flag by citizens of the United States, * * * and (e) supplemented by efficient facilities for ship-building and ship repair. It is declared to be the policy of the United States to foster the development and encourage the maintenance of such a merchant marine."

Ct.Cl. at 93, 586 F.2d at 777. Consequently, Congress authorized long-term subsidy contracts to equalize the position of American-flag and foreign-flag shipowners with respect to operating expenses, construction costs, and foreign subsidies. The Court of Claims has described the system thusly:

Although the details of the legislation have been changed frequently, the basic concept has remained the same—a government authority is empowered to enter into contracts with American shipowners to provide an operating-differential *subsidy*, a construction-differential *subsidy*, and a special *subsidy* to meet extraordinary aid to foreign shipping lines by their governments. The purpose of each *subsidy* is to put the American-flag owner on a parity with his foreign competitor; he is to get his ship for the price his competitor would pay, his labor and operating expenses at the foreign rate, and he is also to be in a position to neutralize any extraordinary help received by his competitor. The Federal Government bears this burden of the higher cost of constructing and operating the ships. In turn, the subsidized shipowner shoulders a number of obligations, chiefly the maintenance of the vessel under United States registry.

Although they appear in separate sections of the Merchant Marine Act, and are meant to serve separate functions, the operating and construction-differential contracts are closely interrelated. An owner accepting construction aid agrees to keep his ship under the American flag for twenty years, an obligation he would and could probably not assume were it not for the operating *subsidy*. Conversely, there is an intimate connection between the plaintiffs' long-term (20-year) operating-differential contracts and their construction agreements. In general, no vessel is eligible for this operating *subsidy* unless constructed in an American yard. In order to guarantee the replacement of obsolete vessels and further stimulate construction in American shipyards, the operating contracts set out for each operator, a schedule of new vessel construction. The owner is obliged to meet this schedule, or subject its operating *subsidy* contract to cancellation, if the Government supplies a construction-differential *subsidy* for each replacement ship.

*Moore-McCormack Lines v. United States, supra*, 188 Ct.Cl. at 650, 413 F.2d at 571 (emphasis added and footnotes omitted).

The Merchant Marine Act of 1936 was subsequently revised by an amendment which changed the construction-differential subsidy system to provide that the shipyard, rather than the purchaser, be the direct applicant for subsidy of ship construction costs. *See Delta Steamship Lines, Inc. v. United States*, 3 Cl.Ct. 559, 560 n. 3 (1983).

■ With the above discussed background of the CDS program in mind, this Court can now turn to the major issue in this case, which is, whether or not this is the type of contract that Congress had in mind to bring within the ambit of the Contract Disputes Act. This Court holds that it is not. This Court believes that these public contracts are not the type of conventional contracts for direct procurement by the Government of tangible property or services, which Congress contemplated including within the scope of the Contract Disputes Act. Specifically, 41 U.S.C. § 602(a) provides that the applicability of the Act is limited to:

[A]ny express or implied contract (including those of the nonappropriated fund activities described in sections 1346 and 1491 of Title 28) entered into by an executive agency for—

(1) the procurement of property, other than real property in being;

(2) the procurement of services;

(3) the procurement of construction, alteration, repair or maintenance of real property; or

(4) the disposal of personal property.

Thus, under the clear wording of the Contract Disputes Act, CDS contracts, which are more in the nature of subsidy/guarantee contracts, are not covered by

the provisions of the Act. This Court has previously considered this exact issue and found that:

> [I]t is concluded from a reading of the Contract Disputes Act and its legislative history that it was not intended to reach this type of contract covering the payment of subsidy for construction of a vessel purchased by a private party for its own use. It is rather the conventional contract for the direct procurement of property, services and construction, to be used directly by the Government, which is the type of Government contract covered by the Act.

*Delta Steamship v. United States, supra,* 3 Cl.Ct. at 569. In reaching this conclusion, Judge Spector expressly rejected the plaintiff's argument that:

> [E]ven though title to a vessel constructed with CDS aid passes to the private purchaser, CDS contracts are in a very real sense contracts for the procurement of property for government service. Because a goal of the CDS program is to maintain an efficient and adequate operational merchant marine for use in times of military emergency, each ship constructed with CDS is not only required to be registered under the U.S. flag, and remain available for government use in an emergency, but also to have various 'National Defense Features' that are subsidized at a 100 percent rate.

*Delta Steamship v. United States, supra,* 3 Cl.Ct. at 569. Although Judge Spector conceded that this was a close question, this Court agrees with his analysis and decision. This is not the type of contract which Congress intended to be covered by the Contract Disputes Act.

The Court notes in this connection that the Merchant Marine Act specifically reposed the power to decide the matter of CDS disputes, at least in the first instance, in the Secretary of Commerce and his delegees.[4] *See* 46 U.S.C. §§ 1152, 1154 (1976); *Moore-McCormack Lines v. United States,*

*supra,* 188 Ct.Cl. at 676, 413 F.2d at 588. In *Moore-McCormack,* the Court of Claims held that:

> [T]he intricate, specialized, and indeterminate nature of the subsidy determination (see Part II, *supra*) makes it peculiarly appropriate for an expert administrative body with continuing experience in the field to make the first full canvass of the problem. Generally, where this is the situation the courts leave to the agency the first gathering and evaluation of the evidence, and the initial making of the determination.

*Moore-McCormack Lines v. United States, supra,* 188 Ct.Cl. at 677, 413 F.2d at 588 (citations omitted). Further, the court stated that before it would undertake to examine the subsidy award that there first had to be a fair and informed Maritime Subsidy Board determination. The court reasoned that "[t]he doctrines of primary jurisdiction and judicial parsimony fuse with the Merchant Marine Act and the contracts to impel us to this conclusion." *Moore-McCormack Lines v. United States, supra,* 188 Ct.Cl. at 678, 413 F.2d at 589. Moreover, the Court also notes that the contracts at issue required disputes to be resolved administratively by the Maritime Subsidy Board before any judicial review was attempted.

In concluding that this is not the type of contract that was meant to be covered by the Contract Disputes Act, the Court has also recognized the fact that the Contract Disputes Act was not intended to apply to every type of contract dispute. *See McDonnell Douglas Corp. v. United States,* 754 F.2d 365 at 368 (Fed.Cir.1985); *Coastal Corp. v. United States,* 713 F.2d 728, 730 (Fed.Cir.1983). In addition, section 4 of the Contract Disputes Act expressly excludes maritime contracts from its coverage. 41 U.S.C. § 603 (Supp.1983). *See Whitey's Welding and Fabrication, Inc. v. United States,* 5 Cl.Ct. 284 (1984). Thus, contrary to the plaintiff's assertions,

---

4. The Maritime Act of 1981, Pub.L. No. 97–31, 95 Stat. 151 (August 6, 1981), transferred this

function to the Secretary of Transportation.

the Contract Disputes Act does not apply to all Government contract disputes and, in particular, this Court concludes that it specifically does not apply to construction-differential subsidy contracts.

While the plaintiff has fashioned its primary jurisdictional argument based on the premise that construction-differential subsidy contracts are the type of contracts that fall within the ambit of 41 U.S.C. § 602(a), it has also argued, in the alternative, that this Court has de novo contract jurisdiction over this matter for another reason. The plaintiff, while recognizing the general rule that contract claims outside the scope of the Contract Disputes Act must *first* be submitted to any mandatory administrative dispute resolution procedure *before* jurisdiction will lie in this Court, argues that this rule should not be enforced where administrative relief is inadequate or unavailable. As the plaintiff explains in its initial brief:

> Where an administrative dispute resolution procedure exists, the agency is deemed to have made an implied warranty to act in a timely and appropriate manner. Its failure to do so is itself a breach of contract. As this Court stated in *Manpower, Inc. of Tidewater v. United States*, 513 F.2d 1396, 1398, 206 Ct.Cl. 726 (1975):
>
> > [I]f there is unreasonable delay in administrative process, the Government has thereby breached its implied obligation to resolve disputes in a reasonable time, and the contractor can then sue directly in this Court if it wishes to do so.
>
> This Court has consistently held that where the agency either refuses to act or takes an inordinately long period of time to do so, whatever administrative remedy might have been provided for by the contract is effectively inadequate and unavailable and the contractor's duty to pursue it is excused. [Citations omitted.]

Thus, the plaintiff argues that, since the defendant has taken an inordinate amount of time to decide the dispute in the contractually proscribed manner, it should be excused from further exhausting its administrative remedies and should be allowed to proceed de novo in this Court.

The problem with the plaintiff's alternative argument, however, is that the facts do not bear out its conclusion that the Maritime Subsidy Board has been dilatory in resolving this dispute. While it is true that the plaintiff initially submitted its claim to the Board in 1979, its claim was hardly ripe for decision until the plaintiff had submitted and settled its primary delay/equitable adjustment claim with the purchasers. During the next five years, the plaintiff and the purchasers were involved in litigation over this matter in an appropriate state court forum. Finally, the plaintiff settled its dispute with the purchasers on January 5, 1984. As earlier indicated, the purchasers were required to pay some 61.75 percent of the contract prices, and the Maritime Subsidy Board was required to pay the remaining 38.25 percent of the contract prices. Thus, it seems fair to conclude that both the plaintiff and the Board were less than anxious to resolve the plaintiff's 1979 claims, until the purchasers' obligation for such costs had been established. Further, although the Maritime Subsidy Board was given copies of the plaintiff's claims for time delays, the Board had no contractual obligation nor authority to participate in the settlement negotiations, between the plaintiff and the purchaser, over extending the contract delivery dates. Accordingly, it was entirely reasonable for the Maritime Subsidy Board to wait until the plaintiff and the purchasers had reached their final settlement on the matter before attempting any conclusive action.

Since the settlement date, January 5, 1984, the record reflects considerable administrative action. To begin with, the plaintiff resubmitted and certified its claim for $4,271,419 to the COSC on January 26, 1984. Such claim reflected a $7 million reduction from the initial uncertified claim submitted by the plaintiff to the Board in 1979. The next day, on January 27, 1984, the plaintiff initiated the instant litigation.

During 1984, there followed a period of negotiations between the plaintiff and the COSC. On February 7, 1985, the Maritime Subsidy Board approved a recommendation from its Acting Secretary noting that "ongoing negotiations between the staff and NNS which have not been successful." Accordingly, the Board ordered the dispute removed from the contracting officer and referred it to an administrative law judge (ALJ) for a hearing and a recommended decision on the dispute. In addition, the Board ordered the referral to the ALJ suspended for 45 days in order to allow time for Mr. Warren G. Leback, the Deputy Maritime Administrator, to conduct further settlement negotiations with the plaintiff.

■ From the above discussion, it is clear that there remains a viable and ongoing administrative dispute resolution process. Consequently, this Court concludes that the plaintiff is incorrect when it asserts that administrative relief is inadequate or unavailable. In view of this Court's historical deference to the Maritime Subsidy Board's expertise on CDS matters, this Court finds that the plaintiff should be required to exhaust its mandatory administrative remedies before invoking this Court's jurisdiction under 28 U.S.C. § 1491. *See Oceanic Steamship Co. v. United States,* 218 Ct.Cl. 87, 586 F.2d 774 (1978); *Farrell Lines, Inc. v. United States,* 204 Ct.Cl. 482, 499 F.2d 587 (1974); *Moore-McCormack Lines, Inc. v. United States,* 188 Ct.Cl. 644, 413 F.2d 568 (1969).

## II. Contract Disputes Act

Assuming that this Court is incorrect in its legal conclusion that this is not the type of contract that Congress intended to bring within the ambit of the Contract Disputes Act, the plaintiff still has a fundamental jurisdictional problem, albeit one that could be cured.

■ In order to bring a direct access action to this Court under the Contract Disputes Act, the plaintiff must have: (1) presented a written and properly certified claim to the Government contracting officer, and (2) obtained a final decision by that

contracting officer on the claim. *T.J.D. Services, Inc. v. United States,* 6 Cl.Ct. 257, 260 (1984); *Thoen v. United States,* 5 Cl.Ct. 823, 825 (1984); *Milmark Services, Inc. v. United States,* 231 Ct.Cl. 954, 956 (1982). *See also Troup Bros. v. United States,* 231 Ct.Cl. 707 (1982); *White Plains Iron Works, Inc. v. United States,* 229 Ct.Cl. 626 (1981); *Paragon Energy Corp. v. United States,* 227 Ct.Cl. 176, 645 F.2d 966 (1981).

■ This Court has consistently interpreted section 605(c)(1) as requiring the furnishing of a certified claim, by the contractor, in order for this Court to acquire direct access jurisdiction over a contract claim exceeding $50,000. 41 U.S.C. § 605(c)(1); *T.J.D. Services, Inc. v. United States, supra,* 6 Cl.Ct. at 260; *Palmer & Sicard, Inc. v. United States,* 4 Cl.Ct. 420, 422 (1984); *Conoc Constr. Corp. v. United States,* 3 Cl.Ct. 146, 148 (1983); *Metric Constr. Co. v. United States,* 1 Cl.Ct. 383, 389 (1983); *Arlington Alliance, Ltd. v. United States,* 231 Ct.Cl. 347, 357, 685 F.2d 1353, 1359 (1982). *Accord W.M. Schlosser Co. v. United States,* 705 F.2d 1336 (Fed. Cir.1983); *Skelly and Loy v. United States,* 231 Ct.Cl. 370, 685 F.2d 414 (1982); *W.H. Moseley Co. v. United States,* 230 Ct.Cl. 405, 677 F.2d 850, *cert. denied,* 459 U.S. 836, 103 S.Ct. 81, 74 L.Ed.2d 77 (1982); *Paul E. Lehman, Inc. v. United States,* 230 Ct.Cl. 11, 673 F.2d 352 (1982); *Folk Constr. Co. v. United States,* 226 Ct.Cl. 602 (1981).

■ Moreover, the contracting officer must have issued his final decision on the properly certified claim before this Court acquires direct access jurisdiction over the claim. 41 U.S.C. § 609(a). Thus, until a final decision has been rendered by the COSC, the plaintiff has not exhausted his administrative remedies. *Tri-Central, Inc. v. United States,* 230 Ct.Cl. 842, 845 (1982). The linchpin for appealing claims under the Contract Disputes Act is the contracting officer's final decision. *T.J.D. Services, Inc. v. United States, supra,* 6 Cl.Ct. at 261; *Paragon Energy Corp. v. United*

*States, supra,* 227 Ct.Cl. at 177, 645 F.2d at 967.

Here, the plaintiff filed a claim on February 1, 1979 with the COSC, seeking monetary damages in the amounts of $5,278,036, under contract MA/MSB–317, and of $6,250,927, under contract MA/MSB–320. On July 19, 1979, the plaintiff filed another claim with the COSC, seeking the same monetary relief as set out in its February 1, 1979, claim. Neither of these contract claims complied with section 605(c)(1) in that the plaintiff failed to certify its claims for monetary relief in excess of $50,000. 41 U.S.C. § 605(c)(1).

On January 26, 1984, the plaintiff submitted a properly certified claim to the COSC in the total amount of $4,271,419 for delays in constructing both ships. In such claim, the plaintiff stated that it "elects to proceed under the Contract Disputes Act of 1978, 41 U.S.C. § 601 *et seq.* The requisite certification is enclosed." However, without waiting for a contracting officer's final decision, as required by 41 U.S.C. § 609(a), the plaintiff one day later initiated the instant suit on January 27, 1984. Thus, this Court's direct access jurisdiction has not been properly invoked.

Congress provided in the Contract Disputes Act that all contract claims were to be presented to and decided by a contracting officer *before* the jurisdiction of this Court can be invoked. Even assuming that the plaintiff's claim is within the scope of the Contract Disputes Act, if this Court allowed the plaintiff's case to proceed, it would be rendering the contracting officer's role in the contract dispute resolution process meaningless. The contracting officer plays a vital role in resolving the vast majority of contract disputes administratively and should be given that opportunity without a judicial sword of Damocles hanging over his head. Furthermore, this Court does not want its docket plugged full of premature direct access contract cases.

■ Thus, the plaintiff's attempt to invoke this Court's direct access jurisdiction should fail. Assuming that its claim is within the scope of the Contract Disputes

Act, it has failed to obtain a contracting officer's final decision *before* initiating this litigation.

### III. Summary

In summary, this Court concludes that construction-differential subsidy contracts, similar to those contained in this case, are not the type of contracts that Congress intended to bring within the ambit of the Contract Disputes Act. Further, the plaintiff must exhaust its administrative remedies before bringing any contract action to this Court under this Court's general Tucker Act jurisdiction, since it has not proven that its administrative remedies are inadequate or unavailable. Finally, even if this contract matter was of the type that could fall within the ambit of the Contract Disputes Act, the plaintiff has failed to obtain a contracting officer's decision, which is a jurisdictional prerequisite for establishing a direct access contract appeal in this Court.

### CONCLUSION

In view of the above discussion, the defendant's motion for summary judgment is granted, the plaintiff's cross-motion for partial summary judgment is denied, and the plaintiff's complaint is to be dismissed without prejudice.